### ESTATE OF JOHN B. THOMPSON, DECEASED.

[No. 12,653; decided May 26, 1894.]

**Testamentary Capacity.**—Upon a Consideration of the Evidence, and of the fact that the proponents of the will in this case failed to produce evidence which was within their power if their contentions were true, it was held that the testator was of unsound mind at the time of the execution of his will.

**Undue Influence.**—Upon an Examination of the Evidence the court found in this case that the will proposed for probate was procured by duress and undue influence.

**Wills—Request to Witness to Sign.**—The request to a witness to sign his name to a will should come from the testator and not from a third person.

J. T. Rogers, for Mrs. A. B. Kidder and Mrs. Mary A. Thompson, proponents of alleged last will dated July 14, 1892.

N. B. Malville, for Margaret Thompson, widow of testator and executrix of will dated January 23, 1867, opposed.

COFFEY, J.   John B. Thompson died on the 7th of August, 1892; his will was filed on 12th of August, 1892, dated January 23, 1867, with a petition for probate thereof; said will (dated January 23, 1867) was admitted to probate on

the 26th of August, 1892, and letters testamentary issued to the widow, Margaret Thompson, on the same date.

The homestead and household furniture were set apart and assigned by order of court to said widow, being all the property of said estate, except a watch and a few small articles appraised at $16.50. On or about the twenty-fifth day of August, 1893, a paper purporting to be another will of said decedent was filed in this court, with a petition for probate thereof, alleging that the same was the last will of said decedent. Margaret Thompson, the widow, demurred to said petition, which demurrer was sustained, with leave to amend. An amended petition was filed on or about the 16th of October, 1893. Afterward in due time said widow filed written grounds of opposition to the probate of said paper, and the petitioners, Mrs. A. B. Kidder and Mary A. Thompson, filed an answer to said opposition.

The issues raised by said petitions and contest were:

1. The competency of decedent to make a will;

2. The freedom of decedent, at the time, from duress, menace, fraud and undue influence;

3. The due execution and attestation of the said paper purporting to be a will.

The cause came up for hearing before the court, a jury having been waived, on the 22d of November, 1893, John T. Rogers, Esq., appearing for petitioners, and N. B. Malville, Esq., appearing for contestant.

Dr. Daniel Maclean, a practitioner for about twenty-seven years, graduate of the Bennett Medical College, and chief of the faculty of California Medical College, eclectic school of medicine, testified that he knew the decedent testator by having visited him at his residence, but did not prescribe for him; deceased had dropsy; the doctor would not guarantee his cure; thought he was sound in mind.

Dr. John William Siefkes testified, in substance, that he was a graduate of Cooper Medical College; he met decedent frequently on the street; he was also attending physician on decedent at his last sickness; this doctor had treated deceased for Bright's disease; deceased was dropsical; had delusions and hallucinations; this doctor had known decedent for five years immediately anterior to his demise, which event oc-

curred August 7, 1892; witness had attended him up to that time; his memory had become impaired by chronic alcoholism; his mind was not sound on the 14th of July, 1892, the date of the instrument now propounded as a will; there was no time from June 1, 1892, to the day of his death, August 7, 1892, that decedent was competent to make a will; deceased was afflicted with Bright's disease, interstitial nephritis, and diseased kidneys.

The physician's testimony came in without objection or exception.

G. S. Eastman, a policeman, testified that decedent was under the influence of liquor nearly all the time in the spring of 1892, and he appeared mentally weak.

Mr. Gibson, an intimate acquaintance of the Thompson family, testified that he had called to see decedent frequently before he died in his last sickness, and that for three months before he died he was not in his right mind, and that his acts and remarks were peculiar and irregular and not like a man in his right mind.

Mrs. Jennie Taylor testified that decedent was not in his right mind on the 14th of July, 1892; he was always drunk; his mind was not right; he did not recognize this witness, sometimes he called her "Maggie" and "Cosgrove"; he asked her who took away the looking-glass on the 16th of July, 1892. The looking-glass was not taken away, but was still there.

Henry Lehrke testified that decedent was "half full" all the time; that something was the matter with his mind in the spring of 1892; he was not the same as he used to be mentally.

William Wiley testified that he was an intimate of decedent before he died; the mind of decedent began to give way and weaken in the spring of 1892, and for six months before he died he was mentally incompetent and unsound.

Mrs. Margaret Thompson, the widow, testified that decedent was not of sound mind for over six months before he died; he would talk of strange things that made her believe that he did not know what he was saying or doing.

This was about all the testimony as to the mental capacity of the decedent to make a will on 14th of July, 1892. Whether the mental incapacity and unsoundness of mind arose from excessive use of liquors or other cause does not

appear, nor does it matter. If decedent was mentally incompetent to make a will on the 14th of July, 1892, that is sufficient.

In behalf of the proponents of the will dated July 14, 1892, the following points, among others, were made:

First—By the code the burden of showing incapacity or other invalidating causes is distinctly placed upon contestant.

Second—Her proof must overcome the following presumptions:

(a) All parties present at the execution of the will and testifying to the circumstances thereof are presumed to speak the truth.

(b) Such witnesses are presumed to be innocent of wrong, and therefore it cannot be imputed to them that they consciously are assisting in the presentation of a spurious will: Code Civ. Proc., 1193; Rice on Evidence, sec. 54.

(c) Sanity is imputed: Rice on Evidence, sec. 48.

(d) Testamentary capacity is always supposed to exist in an adult: Rice on Evidence, sec. 59.

(e) It cannot be said "that because a man is a drunkard, therefore he is of unsound mind. It is a question of fact for the jury or court below to determine whether the inebriety has had the effect of rendering his mind unsound, either permanently or temporarily, covering the time of the execution of the alleged will": Estate of Johnson, 57 Cal. 530.

Third—The amount of property involved is not an essential criterion by which to measure the sanity of decedent.

Nor is the question of the validity of the homestead at this time before this tribunal.

If the document in controversy is in fact the will of decedent, then all the proceedings heretofore taken relative to the alleged will of January 23, 1867, are invalid, and do not furnish the court with legal evidence of any existing fact.

Fourth—The most favorable construction that can be placed upon the testimony of contestant is to the effect that decedent was at times under the mild delirium of intoxication.

The testimony in this case, however, shows that there was no delirium at the time of executing the will.

Fifth—The contestant presented testimony showing that decedent was afflicted with Bright's disease—death resulting therefrom.

As a medical fact, none of the forms of such disease present characteristics of insanity.

In the advanced stages of two forms of the disease there may be a coma which usually precedes and ends in death—rarely does it ever occur at any considerable length of time prior to death.

In this connection the contention of proponents is that alcohol is not usually a cause of the disease.

Dr. Tyson, in his treatise on Bright's Disease and Diabetes; on page 124, relative to chronic parenchymatous nephritis, says: "Although alcohol is not a common cause of chronic parenchymatous nephritis, yet I cannot but think that the chronic nephritis which we find in confirmed drunkards—those who are always saturated with whisky when they can get it—owes its presence to the latter agent. To be sure, it cannot be denied that the exposure to which these outcasts are subjected may be the cause."

On page 167, on interstitial nephritis, he says: "Alcohol, formerly thought to be a potent cause of the cirrhotic kidney, is now acknowledged to be an infrequent one. The analogy of this condition to the cirrhotic liver suggested a similar irritant action of the alcohol in the blood upon the interstitial tissue of the kidney. But although the portal blood contains a large amount of alcohol after its liberal ingestion into the stomach, by the time the blood passes through the heart and lungs and gets into the kidney very little, if any, remains unoxidized. It is barely possible, however, that when enormous quantities are used, enough may remain in the blood passing through the kidney to irritate its connective tissue, and also the cells lining the tubules. The latter, from their efforts to remove it, are probably more frequently irritated than the former; whence also the possibility, though rare, also, of chronic parenchymatous nephritis being caused by it, as referred to in discussing the latter disease."

On page 185, concerning the same disease, he says: "With regard to beverages, there is no doubt that the use of strong alcoholic drinks should be avoided, and brandy, whisky and

strong sherries and ports should be prohibited. The light wines, and especially the red wines, and lighter alcoholic drinks, as lager beer, porter, may be used.''

Henry Doscher, one of the witnesses to the will of July 14, 1892, testified that he knew decedent for twenty years before he died; he was not asked if decedent's mind was sound at the time.

George W. Howe, the person who acted as an attorney in the matter, might have been called as a witness, but he was not produced by proponents of the paper of July 14, 1892. He was the lawyer of Mrs. Kidder, one of the proponents and sister of decedent, who testified that she employed and paid this person ten dollars to make the will.

Frank M. Thompson in his testimony failed to say that decedent's mind was sound on the 14th of July, 1892, when said paper was signed; his answer to a question in relation thereto being, ''he was all right.'' On cross-examination he was interrogated as to any conversation between him and decedent in the buggy when he took decedent to his home on the 14th of July, 1892, but he said he did not remember; still he remembered other matters and what decedent said at other times. The subject matter of that conversation on the 14th of July, 1892, would have thrown some light on his mental condition at that time: Code Civ. Proc., sec. 1963, subds. 5, 6, sec. 2061, subd. 7.

Upon the issue of undue influence the testimony shows that Mrs. Kidder, the sister of decedent, and Mrs. Thompson, his sister in law, came to decedent's home frequently before his death and remained with him at his bedside for some time.

A resident on the opposite side of the street saw, through her window, the sister and sister in law place their arms around decedent when on his sickbed and kiss him on several occasions; they never did this in the presence of his wife. Afterward this sister, Mrs. Kidder, sent her brother Frank with a buggy on the 14th of July, 1892, and took him to Frank's house, where the parties had a person acting as a lawyer; Frank told decedent's wife that he was taking him to see a doctor; he did not take him to a doctor. These facts show a certain influence obtained by said parties over said decedent.

Mrs. Kidder said that decedent told her that he desired to make a will, and her object in sending Frank for him was to have him make a will. Still, those facts were concealed from his wife. When Frank took him off in the buggy he told his wife he was taking him to see a doctor, which was not the fact; it was a misrepresentation to her.

This testimony is sufficient to sustain the issue of duress, fraud and undue influence involved in this proceeding, and also the freedom of decedent at the time; he was in the house of defendants, under their control and power, when this paper, dated July 14, 1892, and drawn by defendants' lawyer, was produced, and decedent was constrained to sign it.

The third issue involved is as to the due execution and attestation of the will.

Frank M. Thompson testified that Mr. Hernan drew it, that he told Hernan what to say in it; Mr. Howe came to Frank's house and spoke to decedent and took down on paper what he said; but it does not appear what decedent told Howe. At all events, Howe did not attempt to put on paper the statement of decedent. Mr. Hernan drew the paper at the dictation of Frank Thompson.

"At the house the lawyer read the paper and handed it to J. B. Thompson, and asked him to sign it." Then it was handed by Howe to Doscher and he was asked to sign it at a certain place, which he did. It does not appear that the certificate to the will was read or explained to the witness.

Testator did not dictate the will or read it. Frank M. Thompson dictated it at the office of the attorney, Mr. Hernan. Frank M. Thompson, in fact, had the will drawn to suit himself.

The testator did not request the witnesses to sign their names as witnesses at the end of the will, and there was no signing done by any of the witnesses at the request of decedent.

The action of Howe in the premises, as appears by the testimony, should not be substituted as the act of decedent—the statute should not be so construed.

The decedent did not declare that the paper of July 14, 1892, was his will. It was not his will, and should be and is denied probate: Civ. Code, sec. 1276.